## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| AMERICAN HOME ASSURANCE COMPANY, a New York Corporation | ) ) ) | |
| Plaintiff | ) ) ) | |
| v. | ) ) | Civil Action File No.10-305 |
| PENSACOLA STEVEDORE COMPANY, INC., PATE STEVEDORE COMPANY, INC., CHAD EVERETT LANGHAM, LAUREN ARD LANGHAM, individually and as mother and next friend of GILLIAN GRACE LANGHAM and EMMA KATE LANGHAM, minors, JASON CARL SHIPP, JENNIFER LYNN SHIPP, individually and as mother and next friend of CAROLINE ELIZABETH SHIPP and SARAH LYNN SHIPP, minors, WILLIAM G. MAYO, DEBORAH H. MAYO, JOHNNY F. IRBY, CARLOS F. WARD, BEVERLY A. WARD, ROBERT WHITE, WANDA WHITE, JOSEPH HAYES and SELENA HAYES, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

### COMPLAINT FOR DECLARATORY JUDGMENT

COMES NOW, Plaintiff, AMERICAN HOME ASSURANCE COMPANY, and files this Complaint for Declaratory Judgment, pursuant to 28 U.S.C. § 2201, seeking a judgment with regard to its insurance coverage obligations under American Home Policies Nos. E76403, E76404, E76405, E76406, E76407 and E098106 to PENSACOLA STEVEDORE COMPANY, INC., and PATE STEVEDORE COMPANY, INC., (collectively referred to as "Pensacola") as well as the Plaintiffs in multiple underlying actions, CHAD EVERETT LANGHAM, LAUREN ARD LANGHAM, individually and as mother and next friend of GILLIAN GRACE LANGHAM and EMMA KATE LANGHAM, minors, JASON CARL SHIPP, JENNIFER

1

LYNN SHIPP, individually and as mother and next friend of CAROLINE ELIZABETH SHIPP

and SARAH LYNN SHIPP, minors, WILLIAM G. MAYO, and DEBORAH H. MAYO[1]

(hereinafter collectively referred to as "the Langham Claimants"), ROBERT WHITE and

WANDA WHITE[2] (hereinafter "the White Claimants"), JOHNNY F. IRBY[3] (hereinafter "the

Irby Claimant"), CARLOS F. WARD, BEVERLY A. WARD[4] (hereinafter "the Ward

Claimants"), JOSEPH HAYES and SELENA HAYES[5] (hereinafter "the Hayes Claimants") (all

collectively referred to as "the Homeowner Claimants"), and alleges as follows:

## INTRODUCTION

1.     American Home Assurance Company ("American Home") seeks a declaration

that it has no coverage obligation (i.e. owes no duty to defend and/or indemnify) to Pensacola

under American Home Policies Nos. E76403, E76404, E76405, E76406, E76407 and E098106

with respect to the claims being asserted against Pensacola by all of the Homeowner Claimants

concerning defective drywall that allegedly released corrosive hydrogen sulfide gas emissions

harming person and property.

---

[1] The Langham, Shipp and Mayo families are plaintiffs in an action captioned *Chadd Everett Langham, et al. v. ACE Home Centers, Inc., et al.,* Civil Action No. CV-2009-900948, filed in the Circuit Court of Baldwin County, Alabama (hereinafter "the Langham Suit"), attached as Exhibit "A".
[2] Mr. and Mrs. White are plaintiffs in the action captioned *White v. ACE Home Centers, Inc., et al.,* Civil Action No. CV-2010-900964, filed in the Circuit Court of Baldwin County, Alabama (hereinafter "the White Suit"), attached as Exhibit "B".
[3] Mr. Irby is the plaintiff in the action captioned *Irby v. ACE Home Centers, Inc., et al.,* Civil Action No. CV-2010-900963, filed in the Circuit Court of Baldwin County, Alabama (hereinafter "the Irby Suit"), attached as Exhibit "C".
[4] Mr. and Mrs. Ward are plaintiffs in the action captioned *Ward v. ACE Home Centers, Inc., et al.,* Civil Action No. CV-2010-900960, filed in the Circuit Court of Baldwin County, Alabama (hereinafter "the Ward Suit"), attached as Exhibit "D".
[5] Mr. and Mrs. Hayes are named plaintiffs, seeking to be representatives of a subclass against Pate Stevedore Company of Pensacola in the multi-district litigation entitled *Gross, et al. v. Knauf GIPS KG, et al.*, Case No. 09-6690, filed in the United States District Court for the Eastern District of Louisiana (hereinafter "the Hayes Suit"), attached as Exhibit "E".

2.      There is an actual, present and bona fide controversy between the parties concerning the alleged coverage obligations of American Home to defend and indemnify Pensacola with respect to the claims involving allegedly defective drywall.

## PARTIES

3.      American Home is a New York Corporation with its principal place of business in New York.

4.      Pensacola Stevedore Company, Inc. is a Florida corporation with its principal place of business in Florida.  Pensacola Stevedore Company, Inc. is believed to be doing business in Baldwin County, Alabama and has been sued by the Homeowner Claimants as a result of their doing business within this district, including but not limited to the sale of the Chinese drywall to Alabama companies and persons.  Further, Pensacola Stevedore Company, Inc. has held itself out as doing business as Pate Stevedore Company, Inc., which is an Alabama corporation. Service of process upon Pensacola Stevedore Company, Inc. through Alabama's Long Arm Statute, Ala. R. Civ. P. 4.2, and may be perfected by serving its registered agent for service, Michael L. Pate at 720A Barracks Street, Bldg. No. 2, Pensacola, Florida 32502.

5.      Pate Stevedore Company, Inc. is an Alabama corporation with its principal place of business in Mobile, Alabama. Service of process upon Pate Stevedore Company, Inc. may be perfected by serving its registered agent for service, David M. O'Brien, One St. Louis Center, Suite 1000, Mobile, Alabama 36652-2025.

6.      Chad Everett and Lauren Ard Langham, and their minor children, Gillian Grace Langham and Emma Kate Langham, reside together at 18995 Pecan Lane, Robertsdale, Alabama 36567 in Baldwin County.  Service of process upon the Langhams may be perfected by serving them at this address.

7.     Jason Carl Shipp, Jennifer Lynn Shipp, and their minor children, Caroline Elizabeth Shipp and Sarah Lynn Shipp, reside together at 18935 Pecan Lane, Robertsdale, Alabama 36567 in Baldwin County.  Service of process upon the Shipps may be perfected by serving them at this address.

8.     William G. Mayo and Deborah H. Mayo reside together at 24434 Hack Road, Bay Minette, Alabama 36507, in Baldwin County.  Service of process upon the Mayos may be perfected by serving them at this address.

9.     Robert White and Wanda White reside together at 15982 Pecan View Dr., Loxley, AL 36551, in Baldwin County. Service of process upon the Whites may be perfected by serving them at this address.

10.    Johnny F. Irby resides at 10920 Charlie Hodges Road, Bay Minnette, AL 36507, in Baldwin County. Service of process upon Mr. Irby may be perfected by serving him at this address.

11.    Carlos F. Ward and Beverly A. Ward reside together at 19710 O'Grady Avenue, Robertsdale, AL 36567, in Baldwin County. Service of process upon the Wards may be perfected by serving them at this address.

12.    Joseph Hayes and Selena Hayes reside together at 3930 Walter Moore Road, Chuncula, Alabama 36521, in Mobile County.  Service of process upon the Hayes may be perfected by serving them at this address.

**JURISDICTION AND VENUE**

13.    This Court has jurisdiction over this matter based upon the provisions of 28 U.S.C. § 1332 (a), as this action is between citizens of different states; and the amount in controversy, exclusive of interest and costs, exceeds the sum and value of $75,000.

14.    The amount of controversy being in excess of $75,000 is supported by the fact that the damage award in the bellwether trial most recently held in the multidistrict litigation in which the Hayes Lawsuit is filed, involving nearly the same facts and circumstances as those presented in the underlying complaints, yielded a damage award in excess of $140,000.  See Order issued in the Hernandez trial attached hereto as Exhibit "F".  Furthermore, the Hayes Complaint asserts damages in excess of $5,000,000.

15.    Venue is properly laid in this Court pursuant to 28 U.S.C. § 1391(a)(2) & (3) as the Homeowner Claimants all reside in this district, the subject properties are located within the district, and the majority of the underlying litigation at issue has been filed in this district.

## GENERAL ALLEGATIONS

### A. *The Defective Drywall Claims Alleged Against Pensacola*

### The Langham Suit

16.    In 2009, the Langham Claimants were homeowners residing in Alabama that initiated Civil Action Case Number CV-2009-900948 against Pensacola and several other defendants seeking damages and injunctive relief for claims of alleged property damage and bodily injury arising out of the presence of allegedly defective drywall in their homes ("the Langham Complaint"). (See Ex. A)

17.    The Langham Claimants generally allege that defective drywall was sold to them and/or installed in their homes by third parties which has resulted in or may result in property damage to their respective homes and/or bodily injury for which they claim medical monitoring is required.

18.    Through the Langham Complaint, the Langham Claimants are seeking class certification under Rule 23 of the Alabama Rules of Civil Procedure on behalf of themselves and

all other similarly situated Alabama residents.  To the extent that class certification is granted, those class members are also referred to herein as the "Langham Claimants" along with the named original plaintiffs.

19.     The Langham Complaint asserts counts of: negligence/gross negligence, strict products liability, unjust enrichment, breach of implied warranty of fitness for a particular purpose, breach of implied warranty of merchantability, breach of express warranty, violation of Alabama's Deceptive and Unfair Trade Practices Act, breach of contract, and equitable and injunctive relief and medical monitoring.

20.     Specifically with regard to Pensacola, the Langham Complaint alleges that Pensacola "sold, offloaded, stored, delivered, imported, supplied, inspected, tested, marketed warranted, and/or advertised the defective Chinese drywall that was installed in the Plaintiffs' residences."

21.     The Langham Complaint also specifically alleges commonality of cause of harm as follows:

    a.  "Said drywall materials were and are uniformly and inherently defective when used for their intended purposes.  The drywall materials were made from waste material – also known as "fly ash" – collected from scrubbers at coal-fired power plants located in China, or alternatively were made with gypsum mined from one or more locations in China where the natural gypsum contained high levels of sulfur." [6]

    b.  "The defective drywall materials emit a combination of sulfide gases which produce a distinctive chemical odor, and cause corrosion to copper and other metal materials such as those used in HVAC systems, electrical systems, gas fuel systems and many appliances, electronics, equipment and other items commonly located in residential dwellings."[7]

    c.  "Hydrogen Sulfide ("H2S"), one of the gases emitted by the defective Chinese drywall materials, is a broad spectrum poison which affects multiple systems in

---

[6] Langham Complaint, Ex. A, ¶ 21.
[7] Id. at ¶ 22.

the human body.  It can form a complex bond with the body's enzymes which can block the binding properties of oxygen, thereby interfering with respiration."[8]

    d.   "Lower level exposures, especially over an extended time, can result in irritated and itchy eyes and skin, difficulty in breathing, sore throat, persistent cough, nausea, bloody noses, runny noses, recurrent headaches, fatigue, loss of appetite, impaired memory function, sinus infection, allergic reactions and asthma attacks. Prolonged exposure has also been implicated in reproductive health issues."[9]

    e.   "As a direct and proximate consequence of the conduct, breaches, acts and omissions of the Defendants, the Plaintiffs and Class Members have incurred economic damages and are entitled to recover monetary damages for: costs of inspection as well as the costs and expenses necessary to replace/repair their homes and/or commercial structures; removal and replacement of all of the drywall contained in their homes and commercial structures; the replacement of other property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, inventory, equipment, personal property, furnishings, electronic appliances, and other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall."[10]

22.    The Langham Complaint asserts that the Langham Claimants suffered bodily injury, incurred economic damages, incidental and consequential damages, and "have been exposed to sulfide gases" and "other harmful chemicals" in "high levels" and, as such, "they have been placed at an increased risk of disease, and require injunctive relief in the form of emergency notice, environmental testing and monitoring, and medical monitoring."

23.    The Langham Claimants allege that Pensacola's actions were intentional, reckless and constitute gross negligence and they demand punitive damages against Pensacola and the other defendants.

### The Complaints filed by the Whites, the Wards and Mr. Irby

24.    In May of 2010 the White Claimants, the Ward Claimants and the Irby Claimant initiated separate suits in the Circuit Court of Baldwin County, Alabama against Pensacola and

---

[8] Ex. A, at ¶ 23.
[9] Id. at ¶ 24.
[10] Id. at ¶ 31.

several other defendants seeking damages for claims of alleged property damage arising out of the presence of allegedly defective drywall in their homes.  These Claimants are represented by the same counsel as the Langham Claimants. (See Exs. B, C and D)

25.     The Complaints filed by White, Ward and Irby Claimants each assert the same allegations against Pensacola and involve the same types of assertions of property damage as alleged in the Langham Complaint.

26.     The White, Ward and Irby Complaints assert counts of negligence, violation of the Alabama Extended Manufacturer's Liability Doctrine, unjust enrichment, breach of the implied warranty of fitness for a particular purpose, breach of the implied warranty of merchantability, breach of an express warranty, violation of Alabama's Deceptive and Unfair Trade Practices Act, breach of contract, fraudulent misrepresentation and fraudulent concealment/suppression based on Pensacola/Pate's sale of the allegedly defective drywall which was used in the construction and/or repair of the plaintiffs' home.

27.     As with the Langham Complaint, these Complaints specifically allege that Pensacola "sold, offloaded, stored, delivered, imported, supplied, inspected, tested, marketed, warranted, and/or advertised the defective drywall."

28.     The White, Ward and Irby Complaints also specifically allege:

a.  The drywall was and is uniformly and inherently defective when used for its intended purposes.  The defective drywall emits a combination of sulfides which produce a distinctive chemical odor and causes corrosion to copper, silver and other metal materials such as those used in HVAC systems, electrical components and systems, gas fuel systems and appliances, electronics, equipment and other items commonly located in residential dwellings.[11]

b.  As a direct and proximate consequence of the conduct, breaches, acts and omissions of the Defendants, Plaintiffs have incurred economic damages and are entitled to recover monetary damages for: costs of inspection and remediation, as well as the costs and expenses necessary to replace or repair their home; removal and replacement of all drywall contained in their home; replacement of other property (HVAC systems and refrigerators, microwaves, faucets, utensils, copper tubing and plumbing, electrical wiring,

---

[11] White, Ward and Irby Complaints, Exs. B, C and D, ¶ 25.

electronics and computers, personal property, furnishings, appliances, and other metal surfaces and household items); and the repair and/or replacement of any materials damaged by the drywall.[12]

29.     The White, Ward and Irby Complaints allege that the Defendants knew or should have known or discovered the defective nature of the drywall.

**The Hayes Complaint**

30.     In May of 2010, the Hayes Claimants intervened as plaintiffs in the multidistrict litigation currently pending in the Eastern District of Louisiana and asserted claims against Pensacola and several other defendants seeking damages for claims of alleged property damage and bodily injury arising out of the presence of allegedly defective drywall in their home. (See Ex. E)

31.     The Hayes Claimants seek to represent a subclass of individuals that either purchased drywall directly from Pensacola or from another entity that purchased the drywall from Pensacola.

32.     The Hayes Complaint specifically alleges as follows:

a.     In "defective drywall" (such as that designed, manufactured, exported, imported, distributed, delivered, supplied, inspected, installed, marketed, and/or sold by Defendants herein), the gypsum and other components of the product break down and release sulfides and other noxious gases that are then emitted (or "off-gassed") from the drywall.[13]

b.     Sulfides and other noxious gases, such as those emitted from Defendants' drywall, cause corrosion and damage to personal property (such as air conditioning and refrigerator coils, faucets, utensils, electrical wiring, copper, electronic appliances and other metal surfaces and property).[14]

c.     Exposure to Sulfide and other noxious gases, such as those emitted from Defendants' drywall, causes personal injury resulting in eye irritation, sore throat and cough, nausea, fatigue, shortness of breath, fluid in the lungs, and/or neurological harm.[15]

d.     As a direct and proximate result of Defendants' actions and omissions, Plaintiffs' and the Class Members' structures, personal property, and bodies have been exposed to

---

[12] Exs. B, C and D. at ¶ 31.
[13] The Hayes Complaint, Ex. E, p. 281, ¶ 1424.
[14] Id., p. 282, ¶ 1425.
[15] Id., ¶ 1426.

Defendants' defective and unfit drywall and the corrosive harmful effects of the sulfide and other noxious gases being released from Defendants' defective drywall.[16]

e.  As a direct and proximate result of Defendants' defective and unfit drywall and the corrosive and harmful effects of the sulfide and other noxious gases being released from these products, Plaintiffs and Class Members have suffered, and continue to suffer economic harm and/or personal injury.[17]

f.  As a direct and proximate result of Defendants' defective and unfit drywall and the corrosive and harmful effects of the sulfide and other noxious gases being released from these products, the Plaintiffs and the Class Members have suffered, and continue to suffer damages.  These damages include, but are not limited to, costs of inspection; costs and expenses necessary to remedy, replace and remove the defective drywall and other property that has been impacted; lost value or devaluation of their homes, residences or structures and property as a direct result of damage caused to the property and indirect damage resulting from perceived defects to the property, including stigma damages; loss of use and enjoyment of their home and property; and/or damages associated with personal injuries.[18]

g.  As a direct and proximate result of Defendant's defective and unfit drywall and the corrosive and harmful effects of the sulfide and other noxious gases being released from these products, Plaintiffs and the Class Members have been exposed to toxic gases, suffered personal injury, have been placed at an increased risk of disease, and have need for injunctive relief in the form of repair and remediation of their home, recision of their home purchase contracts, the ordering of emergency/corrective notice, the ordering of environmental testing and monitoring and/or the ordering of medical monitoring.[19]

33.    The Counts asserted in the Hayes Complaint which apply to Pate involve claims seeking damages for: negligence, negligence per se, strict liability, breach of warranty, negligent discharge, violations of the applicable consumer protection acts, private nuisance, unjust enrichment, as well as equitable and injunctive relief.

**B.  The American Home Primary Policies**

34.    American Home first issued Policy No. E076403 to the Named Assured Pensacola Stevedore Company, Inc. at 720 Barracks St., Pensacola, Florida 32501 for the effective policy period of July 3, 2003 through July 3, 2004. That Policy has since been renewed under consecutive Policy numbers (E076404, E076405, E076406) through to Policy E76407,

---

[16] Ex. E, ¶ 1427.
[17] Id., ¶ 1431.
[18] Id., ¶ 1432.
[19] Id., ¶ 1433.

which expired on July 3, 2008 (the "Primary Policies"). A true and correct copy of the original Primary Policy and the subsequent Renewal Certificates and Endorsements are attached hereto as Exhibit "G".

35.    The Primary Policies E76403, E76404, E76405, E76406 provided Pensacola with Commercial Marine Liability ("CML") and Marine Terminal Operator's Liability ("MTOL") coverage with a per occurrence limit of $2,000,000, including Supplementary Payments[20], a $10,000 per occurrence general deductible, and a $25,000 per occurrence deductible for pollution claims subject to the terms, conditions, exclusions and limitations contained in the Policy. (Ex. G., p. 1).

36.    Primary Policy E76407 provided Pensacola with CML and MTOL coverage with a per occurrence limit of $1,000,000, including Supplementary Payments, a $10,000 per occurrence general deductible, and a $25,000 per occurrence deductible for pollution claims subject to the terms, conditions, exclusions and limitations contained in the Policy. (Ex. G., Renewal Certificate, Policy No. E076407).

37.    For all Primary Policies, the CML coverage contains the same relevant terms, conditions, limitations, and exclusions.  The relevant portions of the Primary Policies are cited in context below. (Ex. G).

38.    For all Primary Policies, the MTOL Coverage Form only provided coverage to the assured for liability arising out of its stevedoring activities and, as such, it has no application to Pensacola's claim for damage or injury arising out the sale of allegedly defective drywall. (Ex. G, Endorsement No. 1).

---

[20] The Primary Policies defined "Supplementary Payments" as including "all expenses the Company incurs, including but not limited to "defense costs."

### C.  *The American Home Bumbershoot Policy*

39.     American Home issued Policy No. E098106 to the Named Assured Pensacola Stevedoring Company, Inc. D/B/A/ Pate Stevedoring Company, Inc. at P.O. Box 12781, Pensacola, Florida 32591 for the effective policy period of July 3, 2006 through July 3, 2007 ("Bumbershoot Policy"). A true and correct copy of the Bumbershoot Policy is attached hereto as Exhibit "H".

40.     The Bumbershoot Policy provided $3,000,000 of liability coverage per occurrence and in the aggregate for personal injuries (defined inclusive of bodily injury) and property damage in excess of the limits of the scheduled underlying policies or excess $25,000 Ultimate Net Loss for losses not covered by the scheduled underlying policies with all coverage subject to the terms, conditions, exclusions and limitations contained in the Bumbershoot Policy. (Ex. H, pp. 1-2).

41.     Primary Policy No. E076506 is listed on the Schedule of Underlying Insurances in the Bumbershoot Policy. (*Id*., p. 14).

### D.  *American Home's Reservations of Rights Letters*

42.     Pensacola has demanded that American Home provide it with a defense and indemnity for the claims alleged against it in the Homeowner Claimants' Lawsuits.

43.     American Home is currently defending Pensacola against the claims alleged in the Homeowner Claimants' Lawsuits pursuant to Reservation of Rights and a Partial Declination under the Primary Policies.

## COUNT I

## THERE IS NO COVERAGE AFFORDED TO PENSACOLA UNDER ANY OF THE PRIMARY POLICIES OR THE BUMBERSHOOT POLICY

44.     Petitioner reasserts each and every allegation set forth in paragraphs 1 through 43 herein and incorporates same by reference.

45.     Petitioner seeks a declaration by the Court that, pursuant to the terms, conditions, limitations and exclusions in each of the Primary Policies, American Home has no coverage obligation to Pensacola for any of the liability alleged against it by the Homeowner Claimants.

46.     Petitioner seeks a declaration by the Court that, pursuant to the terms, conditions, limitations and exclusions of the Bumbershoot Policy, American Home has no coverage obligation to Pensacola for any of the liability alleged against it by the Homeowner Claimants.

## COUNT II

## THE COST TO REPAIR, REPLACE, REMOVE, AND/OR DISCARD THE DEFECTIVE DRYWALL DOES NOT CONSTITUTE PROPERTY DAMAGE UNDER THE PRIMARY AND BUMBERSHOOT POLICIES

47.     Petitioner reasserts each and every allegation set forth in paragraphs 1 through 46 herein and incorporates same by reference.

48.     All of the Primary Policies state in the "Insuring Agreement" that the insurer:

will pay those sums that the Assured shall become legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.[21]

49.     The Primary Policies apply to "property damage" which is "caused by an "occurrence" that takes place during the policy period. (Ex. G, p. 7).

50.     An occurrence is defined under each and all of the Primary Policies as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Ex. G, p. 27).

---

[21] Ex. G, p. 7.

51.     The Bumbershoot Policy provides that the insurer will indemnify the insured, subject to the terms, conditions, limitation and exclusions contained therein, for all sums, which the insured "shall become legally liable to pay… on account of… property damage." (Ex. H, p. 1).

52.     An occurrence is defined in relevant part under the Bumbershoot as "an event or a continuous or repeated exposure to conditions which unintentionally causes injury, damage or destruction resulting during the policy period." (*Id*., p. 13).

53.     "Property damage" is defined by the American Home Primary Policies in relevant part as "physical injury to tangible property" or "loss of use of tangible property." (Ex. G, p. 28).

54.     "Property damage" is defined by the American Home Bumbershoot Policy in relevant part as "loss of or direct damage to or destruction of tangible property." (Ex. H, p. 12).

55.     Petitioner seeks a declaration by the Court that based upon public policy and the terms of the Policies, it has no coverage obligations to Pensacola under any of the American Home Policies for liability asserted against Pensacola for the cost to repair, replace, remove and/or discard the allegedly defective drywall it allegedly sold as all such costs do not arise out of an "occurrence" of "property damage" as defined as insurable under the terms of the American Home Policies.

## **COUNT III**

**COVERAGE FOR THE DEFECTIVE DRYWALL ITSELF IS EXCLUDED UNDER THE PRIMARY AND BUMBERSHOOT POLICIES**

56.     Petitioner reasserts each and every allegation set forth in paragraphs 1 through 55 herein and incorporates same by reference.

57.     Pensacola seeks a defense and indemnity for the claims alleged against it by the Claimants for the costs to repair, replace, remove and/or discard the allegedly defective drywall itself.

58.     In the event any loss or damage claimed by the Homeowner Claimants for the costs to repair, replace, remove and/or discard the allegedly defective drywall itself is found to be itself an "occurrence" of "property damage" under the Primary Policies and/or the Bumbershoot Policy, which is denied by American Home, then the following exclusions apply to bar coverage.

59.     For all Primary 'Policies, Exclusion "j" – "<u>Damage to the Assured's Product</u>" excludes coverage for "'[p]roperty damage' to 'the Assured's Product' arising out of it or any part of it." (Ex. G, p. 10).

60.     For all Primary Policies, "the Assured's Product" is defined in relevant part as "any goods or products…sold, handled, distributed or disposed of by (1) the Assured" and includes "warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'the Assured's Product'" as well as "the providing or failure to provide warnings or instructions." (*Id.*, p. 28).

61.     For all Primary Policies, Exclusion "m" – "<u>Recall of Products, Work or Impaired Property</u>" excludes coverage for "loss, cost or expense… for loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of 'Your Product'" if it is withdrawn or recalled because of a "known or suspected defect, deficiency, inadequacy or dangerous condition in it." (*Id.*, p. 10).

62.     Conditional Exclusion "e" of the Bumbershoot Policy provides that American Home shall be free from liability so long as it is not covered by an underlying policy for liability

arising out of goods or products manufactured, sold, handled or distributed by the Assured or by others trading under his name (hereinafter called "the Assured's Products") if the occurrence occurs after possession of such goods or products has been relinquished to others by the Assured or by others trading under his name and if such occurrence occurs away from premises owned, rented or controlled by the Assured; provided such goods or products shall be deemed to include any container thereof, other than a vehicle, but shall not include any vending machine or any property, other than such container, rented to or located for use of others but not sold…[22]

63.     The allegedly defective drywall is alleged to have been sold, handled and/or distributed by Pensacola and the alleged property damage is alleged to have occurred after the possession of the drywall had been relinquished to others and away from Pensacola's premises.

64.     Petitioner seeks a declaration by the Court that it has no obligation to defend or indemnify Pensacola under any of the Primary Policies for the costs to repair, replace, remove and/or discard the allegedly defective drywall itself because coverage for those claims, inclusive of the Homeowner Claimants' claims for breach of an express or implied warranty or for any failure to warn, are barred under the definition of "the Assured's Product" and Exclusions "j" and/or "m".

65.     Petitioner also seeks a declaration by the Court that as a result of the application of the definition of "the Assured's Product" and exclusions "j" and/or "m" under all of the Primary Policies, there is also no coverage for the costs to repair, replace, remove and/or discard the allegedly defective drywall itself or for any liability or expense for any breach of an express or implied warranty or for any failure to warn under Conditional Exclusion "(e)" of the Bumbershoot Policy.

---

[22] Ex. H, p. 7.

## COUNT IV

**COVERAGE FOR THE ALLEGED DAMAGE TO PROPERTY OTHER THAN THE DRYWALL ITSELF IS EXCLUDED UNDER THE HEALTH HAZARD AND/OR THE POLLUTION EXCLUSIONS IN BOTH THE PRIMARY AND BUMBERSHOOT POLICIES**

66.    Petitioner reasserts each and every allegation set forth in paragraphs 1 through 65 herein and incorporates same by reference.

67.    Pensacola seeks a defense and indemnity for the claims alleged against it by the Homeowner Claimants for physical property damage to property other than the defective drywall which is claimed to have been caused by the allegedly defective drywall.

68.    The Homeowner Claimants assert that the corrosive hydrogen sulfide gaseous emissions discharged or released by the allegedly defective drywall are a "broad spectrum poison[23]" and that exposure to or the absorption of the corrosive gaseous emissions caused physical property damage, including, but not limited to, corrosion of copper and other metals used in HVAC and electrical systems, gas fuel systems, appliances, electronics and equipment.

69.    In all relevant policies, the Health Hazard Exclusion (Paramount Exclusion "e"[24] of the Primary Policies and Absolute Exclusion in the Bumbershoot Policy[25]) provides that the policy:

> shall not apply to any liability for…Property Damage made by or on behalf of any person or persons directly or indirectly on account of continuous, intermittent or repeated exposures to, ingestion, inhalation, or absorption of any substances, materials, products, wastes or emissions, noise or environmental disturbance where the Assured is or may be liable for any reason including, but not limited to, as a result of the manufacture, production, extraction, sale, handling, utilization, distribution, disposal or creation by or on behalf of the Assured of such substances, materials, products, wastes or emissions, noise or environmental disturbance.  (emphasis added)

---

[23] See Ex. A
[24] Ex. G, p. 3.
[25] Ex. H, p. 8.

70.     All of the Primary Policies contain an Absolute Pollution Exclusion (Paramount Exclusion "j"[26]) which precludes coverage under those Primary Policies for claims of property damage:

> arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials, oil or other petroleum substance or derivative (including any oil refuse or oil mixed wastes) or other irritants, contaminants or pollutants into or upon land, the atmosphere, or any watercourse or body of water.

71.     All of the Primary Policies also contain a Pollution Limitation Endorsement (No. 4[27]) which contains the same exclusionary language as the Absolute Pollution Exclusion but provides a buy back provision if the loss meets multiple conditions both with regard to notice and the sudden and accidental nature of the pollution.

72.     Pensacola has failed to meet the conditions required to trigger coverage under the buy back provision of the Pollution Limitation Endorsement.

73.     The Bumbershoot Policy contains a Pollution Exclusion (Absolute Exclusion "e"[28]) which excludes coverage for liability or expense arising:

> directly or indirectly in consequence of the actual or potential discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, petroleum products or derivatives, liquids or gases, waste materials, sewage or other toxic chemicals, irritants, contaminants or pollutants into or upon land, atmosphere, or any watercourse or body of water.

74.     Petitioner seeks a declaration by the Court that it has no coverage obligation to Pensacola under the Primary Policies for all claims of property damage to property other than the defective drywall itself caused by the release of and exposure to the hydrogen sulfide gaseous emissions from the defective drywall because such claims are excluded under the terms of the Health Hazard Exclusion and/or the Absolute Pollution Exclusion and/or the Pollution Limitation Endorsement.

---

[26] Ex. G, p. 4.
[27] *Id.*, p. 34.
[28] Ex. H, p. 8.

75.     Petitioner also seeks a declaration by the Court that it has no coverage obligation to Pensacola under the Bumbershoot Policy for all claims of property damage to property other than the defective drywall itself caused by the release of and exposure to the hydrogen sulfide gaseous emissions from the defective drywall because such claims are excluded under the terms of the Health Hazard Exclusion and/or the Pollution Exclusion.

<u>COUNT V</u>

**COVERAGE FOR THE ALLEGED BODILY INJURY IS EXCLUDED UNDER THE HEALTH HAZARD AND POLLUTION EXCLUSIONS IN BOTH THE PRIMARY AND BUMBERSHOOT POLICIES**

76.     Petitioner reasserts each and every allegation set forth in paragraphs 1 through 75 herein and incorporates same by reference.

77.     Pensacola seeks a defense and indemnity for the claims alleged against it by the Langham and Hayes Claimants[29] for claims of bodily injury that allegedly have occurred or that may occur and for those Claimants' demands for medical monitoring and the related injunctive relief.

78.     Certain of the Homeowner Claimants assert that drywall that is alleged defective released hydrogen sulfide gaseous emissions that is a "broad spectrum poison[30]" and that those Claimants' exposure to those gaseous sulfide emissions has or may cause them bodily injury for which they will need medical monitoring.

---

[29] As of the date of this filing, the Langham and Hayes Claimants are the only Homeowner Claimants that have asserted bodily injury claims arising out of the presence of the Chinese drywall in their homes. American Home reserves its right to amend this Complaint should other Homeowner Claimants assert claims of bodily injury against Pensacola.

[30] See Ex. A

79.     In all relevant policies, the Health Hazard Exclusion (Paramount Exclusion "e"[31] of the Primary Policies and Absolute Exclusion in the Bumbershoot Policy[32]) provides that the policy:

> shall not apply to any liability for <u>Bodily Injury</u>… made by or on behalf of any person or persons directly or indirectly <u>on account of continuous, intermittent or repeated exposures to, ingestion, inhalation, or absorption of</u> any substances, materials, products, wastes or emissions, noise or environmental disturbance where the Assured is or may be liable for any reason including, but not limited to, as a result of the manufacture, production, extraction, sale, handling, utilization, distribution, disposal or creation by or on behalf of the Assured of such substances, materials, products, wastes or emissions, noise or environmental disturbance.  (emphasis added)

80.     All of the Primary Policies contain an Absolute Pollution Exclusion (Paramount Exclusion "j"[33]) which precludes coverage under the Primary Policies for claims of bodily injury:

> arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials, oil or other petroleum substance or derivative (including any oil refuse or oil mixed wastes) or other irritants, contaminants or pollutants into or upon land, the atmosphere, or any watercourse or body of water.

81.     All of the Primary Policies also contain a Pollution Limitation Endorsement (No. 4)[34] which contains the same exclusionary language as the Absolute Pollution Exclusion but provides a buy back provision if the loss meets multiple conditions both with regard to notice and the sudden and accidental nature of the pollution.

82.     Pensacola has failed to meet the conditions required to trigger coverage under the buy back provision of the Pollution Limitation Endorsement.

83.     The Bumbershoot Policy contains a Pollution Exclusion (Absolute Exclusion "e"[35]) which excludes coverage for liability or expense arising:

> directly or indirectly in consequence of the actual or potential discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, petroleum products or derivatives, liquids or gases,

---

[31] Ex. G, p. 3.
[32] Ex. H, p. 8.
[33] Ex. G, p. 4.
[34] *Id.*, p. 34.
[35] Ex. H, p. 8.

waste materials, sewage or other toxic chemicals, irritants, contaminants or pollutants into or upon land, atmosphere, or any watercourse or body of water.

84.     Petitioner seeks a declaration by the Court that it has no coverage obligation to Pensacola under the Primary Policies for the claims of bodily injury and any related injunctive relief, including, but not limited to, the demand for medical monitoring, caused by the release of and exposure to the hydrogen sulfide gaseous emissions from the defective drywall because such claims are excluded under the terms of the Health Hazard Exclusion and/or the Absolute Pollution Exclusion and/or the Pollution Limitation Endorsement.

85.     Petitioner seeks a declaration by the Court that it has no coverage obligation to Pensacola under the Bumbershoot Policy for the claims of bodily injury and any related injunctive relief, including, but not limited to, the demand for medical monitoring, caused by the release of and exposure to the hydrogen sulfide gaseous emissions from the defective drywall because such claims are excluded under the terms of the Health Hazard Exclusion and/or the Pollution Exclusion.

## COUNT VI

### COVERAGE FOR PUNITIVE DAMAGES IS EXCLUDED UNDER THE PRIMARY AND BUMBERSHOOT POLICIES

86.     Petitioner reasserts each and every allegation set forth in paragraphs 1 through 85 herein and incorporates same by reference.

87.     Pensacola seeks a defense and indemnity for the claims alleged against it by the Homeowner Claimants for punitive damages.

88.     All of the Primary Policies (Paramount Exclusion "h"[36]) and the Bumbershoot Policy (Absolute Exclusion[37]) exclude coverage for "fines, penalties, punitive damages, treble damages, or any other damages resulting from the multiplication of compensatory damages."

89.     Petitioner seeks a declaration by the Court that American Home has no obligation under any of the Primary Policies or the Bumbershoot Policy to defend or indemnify Pensacola against any claim for punitive damages, fines, penalties, treble damages or any other damage resulting from the multiplication of compensatory damages.

<u>COUNT VII</u>

**THERE IS NO COVERAGE UNDER ANY OF THE PRIMARY AND BUMBERSHOOT POLICIES FOR THE CLAIMS OF EQUITABLE AND INJUNCTIVE RELIEF ASSERTED AGAINST PENSACOLA**

90.     Petitioner reasserts each and every allegation set forth in paragraphs 1 through 80 herein and incorporates same by reference.

91.     Pensacola seeks a defense and indemnity for the claims of equitable and injunctive relief alleged against it by the Langham and Hayes Claimants, which includes, but is not limited to, a claim for environmental and medical monitoring.

92.     The allegations asserted by certain of the Homeowner Claimants with regard to those count for equitable and injunctive relief seek monitoring in the future for the purpose of diagnosing and preventing health and environmental problems that have not and may never occur.

93.     Coverage for the property damage and bodily injury claims under each of the Primary Policies and the Bumbershoot Policy is excluded as previously asserted herein.

---

[36] Ex. G, p. 4.
[37] Ex. H, p. 9.

94.    Furthermore, to the extent that this Count as asserted by certain of the Homeowner Claimants does not involve actual bodily injury that has already occurred but rather only bodily injury that may occur in the future, the allegations do not set forth a claim for bodily injury that has occurred within any of the Primary Policies' effective periods nor the effective policy period for the Bumbershoot Policy.

95.    The allegations asserted by these types of counts also seek immediate repair, replacement and remedying of the drywall and other contaminated property and, for the reasons addressed above concerning the claims for the cost to repair, replace, remove or discard the allegedly defective drywall itself as well as those expressed with regard to the other claims of property damage, there is no defense or indemnity coverage for this alleged liability under the Primary Policies or the Bumbershoot Policy.

96.    Petitioner seeks a declaration by the Court that American Home has no coverage obligation to Pensacola under the Primary Policies or the Bumbershoot Policy for any of the allegations asserted with regard to the Homeowner Claimants' requests for such equitable and injunctive relief.

## COUNT VIII

### COVERAGE IS EXCLUDED FOR EXPECTED OR INTENDED PROPERTY DAMAGE OR BODILY INJURY UNDER THE PRIMARY AND BUMBERSHOOT POLICIES

97.    Petitioner reasserts each and every allegation set forth in paragraphs 1 through 96 herein and incorporates same by reference.

98.    In the various counts of the Langham, White, Ward and Irby Complaints, the Homeowner Claimants allege that Pensacola knew of the alleged defects in the drywall, knew of the risks of said defects both to property and person, "knowingly conceal[ed], suppress[ed] or omit[ed] material facts," "engaged in deceptive acts" and that its conduct was "intentional."

99.     Exclusion "a" in all the Primary Policies specifically excludes coverage under those policies for "'bodily injury' or 'property damage' expected or intended from the standpoint of the Assured." (Ex. G, p. 7).

100.     The Bumbershoot Policy provides coverage for "occurrences" which "unintentionally cause injury, damage or destruction."[38]

101.     To the extent alleged and/or proven against Pensacola, Petitioner seeks a declaration by the Court that American Home has no coverage obligation to Pensacola under any of the Primary Policies for any bodily injury or property damage expected or intended by Pensacola.

**COUNT IX**

**THERE IS NO COVERAGE FOR THE CLAIMS OF A BREACH OF
ALABAMA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
UNDER THE PRIMARY AND BUMBERSHOOT POLICIES**

102.     Petitioner reasserts each and every allegation set forth in paragraphs 1 through 101 herein and incorporates same by reference.

103.     Pensacola seeks a defense and indemnity for the claims alleged against it by the Claimants for their alleged breach of Alabama's Deceptive and Unfair Trade Practices Act ("ADUTPA").

104.     All of the Primary Policies as well as the Bumbershoot Policy provide coverage for occurrences of property damage and bodily injury, subject to the terms, conditions, limitations and exclusions contained in those Policies.

105.     Petitioner seeks a declaration by the Court that American Home has no coverage obligation to Pensacola under the Primary Policies or Bumbershoot Policy for any alleged conduct in violation of the ADUPTA as that claim does not constitute a claim for property

---

[38] See Ex. H, Amendments to Standard Bumbershoot Wording, ¶ 1.

damage, bodily injury or personal or advertising injury under the terms of any of the Primary or Bumbershoot Policies.

### COUNT X

**COVERAGE IS EXCLUDED FOR THE CLAIMS OF A BREACH OF CONTRACT UNDER THE PRIMARY AND BUMBERSHOOT POLICIES**

106.    Petitioner reasserts each and every allegation set forth in paragraphs 1 through 105 herein and incorporates same by reference.

107.    Pensacola seeks a defense and indemnity for the claims alleged against it by the Homeowner Claimants arising out of their alleged breach of contract.

108.    All of the Primary Policies as well as the Bumbershoot Policy provide coverage for occurrences of property damage and bodily injury, subject to the terms, conditions, limitations and exclusions contained in those Policies.

109.    All of the Primary Policies exclude "'Bodily injury' or "property damage" for which the Assured is obligated to pay damages by reason of the assumption of liability in a contract or agreement…" (Ex. G, Exclusion "b").

110.    The Bumbershoot Policy excludes liability assumed under a contract unless that liability is covered by the underlying policy (Ex. H, Conditional Exclusion "d").

111.    Petitioner seeks a declaration by the Court that American Home has no coverage obligation to Pensacola under any of the Primary Policies for any alleged liability of Pensacola that is based on the breach of a contractual obligation as that claim does not constitute a claim for property damage, bodily injury or personal injury and is otherwise excluded under Exclusion "b" under the Primary Policies.

112.    Petitioner further seeks a declaration by the Court that, as there is no coverage for any liability based on the breach of a contractual obligation under the Primary Policy, American

Home has no obligation under the Bumbershoot Policy to indemnify Pensacola for any alleged breach of contract pursuant to the terms of Conditional Exclusion "e".

## COUNT XI

**THERE IS NO COVERAGE FOR PENSACOLA UNDER COVERAGE SECTION 2 - PERSONAL AND ADVERTISING INJURY OR COVERAGE SECTION 3 - MEDICAL PAYMENTS – PROVIDED BY ANY OF THE PRIMARY POLICIES**

113.    Petitioner reasserts each and every allegation set forth in paragraphs 1 through 112 herein and incorporates same by reference.

114.    The Claimants allege that they are entitled to recover for property damage, bodily injury that has occurred or may occur as well as for future medical monitoring.

115.    The Homeowner Claimants' Complaints do not allege any claim of liability against Pensacola which comes within the definition of personal or advertising injury as set forth in the Primary Policies.

116.    Each of the Primary Policies provides Premises Medical Payments coverage with a maximum limit of $5,000 any one person. (Ex. G, Declarations).

117.    The Premises Medical Payments coverage provided by each of the Primary Policies extends coverage for "medical expenses …for 'bodily injury' caused by an accident: (1) on the premises the Assured owns or rents; (2) on ways next to premises the Assured Owns or rents; or (3) because of the Assured's operations. (*Id.*, p. 14).

118.    The coverage is further limited to accidents that take place during the policy period and for which expenses are reported within one year of the date of the accident. (*Id.*).

119.    The last policy issued by Petitioner to Pensacola expired on July 3, 2008 and the first report of any potential loss related to the allegedly defective drywall was first reported to the Petitioner in September of 2009, more than one year from the date of the expiration of the policy period.

120.     The Premises Medical Payments coverage provided by each of the Primary Policies excludes coverage for "bodily injury" which is otherwise excluded under Section 1 "Bodily Injury and Property Damage Liability" or under the Health Hazard Exclusion, the Pollution Exclusion or the Pollution Limitation Endorsement. (*Id.*, p. 15).

121.     There is no Premises Medical Payments coverage afforded by the Bumbershoot Policy and Petitioner seeks a declaration by the Court of same.

122.     Petitioner seeks a declaration by the Court that American Home has no coverage obligations to Pensacola of Pensacola under Coverage Section 2 - Personal and Advertising Injury or Coverage Section 3 - Medical Payments – provided by any of the primary policies.

## COUNT XII

**THERE IS NO COVERAGE FOR THE DEFENSE OR INDEMNITY OF
PENSACOLA UNDER THE MTOL COVERAGE PROVIDED
BY ANY OF THE PRIMARY POLICIES**

123.     Petitioner reasserts each and every allegation set forth in paragraphs 1 through 122 herein and incorporates same by reference.

124.     Pensacola seeks a defense and indemnity under each of the Primary Policies for the allegations of property damage and bodily injury that allegedly arose out of Pensacola's sale, distribution or handling of the Chinese drywall.

125.     The MTOL Coverage Form only affords coverage for "physical loss or damage to vessels", "damage to property of others as a result of an accident involving a vessel", damage to cargoes, and bodily injury "as a result of any accident involving a non-owned vessel." (Ex. G, p. 30).

126.     There is no specific MTOL coverage afforded by the Bumbershoot Policy.

127.     Petitioner seeks a declaration by the Court that American Home has no coverage obligation to Pensacola for any of the liability alleged against Pensacola by the Homeowner

Claimants under the terms, conditions, limitations and exclusions of the MTOL coverage provided by any of the Primary Policies.

## COUNT XIII

**THERE IS NO COVERAGE UNDER ANY AMERICAN HOME POLICY FOR BODILY INJURY AND PROPERTY DAMAGE THAT OCCURRED OUTSIDE OF THE POLICIES' EFFECTIVE POLICY PERIODS**

128.   Petitioner reasserts each and every allegation set forth in paragraphs 1 through 127 herein and incorporates same by reference.

129.   American Home insured Pensacola under separate Primary Policies starting in July 3, 2003, which were renewed on similar terms consecutively through July 3, 2008.

130.   American Home insured Pensacola under the Bumbershoot Policy for the single effective policy period of July 3, 2006 through July 3, 2007.

131.   Each American Home Primary Policy and the Bumbershoot Policy require that in order for property damage or bodily injury to be covered under the Policy, the property damage or bodily injury must occur within the Policy's effective policy period. (Ex. G, p. 7 and Ex. H, p. 2, respectively).

132.   Petitioner seeks a declaration by the Court for each Primary Policy and the Bumbershoot Policy that American Home has no coverage obligations to Pensacola for any property damage or bodily injury suffered by any Claimant that did not occur within the respective Policy's effective policy period.

## COUNT XIV

### IN THE ALTERNATIVE, IF THERE IS DEEMED TO BE COVERAGE FOR ANY ALLEGED PROPERTY DAMAGE OR BODILY INJURY ALL SUCH PROPERTY DAMAGE AND/OR BODILY INJURY CONSTITUTES A SINGLE OCCURRENCE

133.   Petitioner reasserts each and every allegation set forth in paragraphs 1 through 132 herein and incorporates same by reference.

134.   Each of the Primary Policies define "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions" and that definition further states that "in the event of continuing or progressively deteriorating damage over any length of time, such damage shall be deemed to be one occurrence, and shall be deemed to occur only when such damage first commences." (Ex. G, p. 27).

135.   The "Limits of Insurance" provided in the Declarations of each Primary Policy is the most American Home will pay regardless of the number of assureds, "claims made", "'suits' brought" or "persons or organizations making claims or bringing 'suits'." (*Id.*, p. 20).

136.   Each of the Primary Policies states that the limit is per "each occurrence including Supplementary Payments" and "Supplementary Payments" is defined in each of those policies to include "[a]ll expenses the Company incurs, including but not limited to 'defense costs'." (*Id.*, Declarations and p. 16).

137.   Petitioner seeks a declaration by the Court, that if property damage or bodily injury caused by defective drywall that released sulfide gaseous emissions is deemed to have first occurred during any of the Primary Policies' effective periods, and if that property damage or bodily injury is covered and not otherwise excluded, then in that event, Petitioner pleads, in the alternative, that all property damage and bodily injury suffered by all Homeowner Claimants resulting from Pensacola's sale of all drywall having the same common defective condition that

caused the harm shall be considered a single occurrence under the Primary Policy in force when such first property damage or bodily injury occurred.

## COUNT XV

### IN THE ALTERNATIVE, IF THERE IS DEEMED TO BE COVERAGE FOR ANY ALLEGED PROPERTY DAMAGE OR BODILY INJURY UNDER THE PRIMARY POLICIES, THEN ANY COVERAGE AFFORDED BY THE PRIMARY AND BUMBERSHOOT POLICIES IS EXCESS OF ANY OTHER INSURANCE

138.    Petitioner reasserts each and every allegation set forth in paragraphs 1 through 137 herein and incorporates same by reference.

139.    Petitioner seeks a declaration by the Court, if it is determined that the Homeowner Claimants' allegations of bodily injury and property damage against Pensacola constitute a covered occurrence and are not otherwise excluded under the terms of the Primary Policies and Pensacola has any other insurance which provides coverage for its liability to the Homeowner Claimants, that the Primary and Bumbershoot Policies provide only excess coverage to that other insurance.

## PRAYER

WHEREFORE, Petitioner respectfully prays the Court for the entry of judgment in its favor, and to grant Petitioner further relief as follows:

A.    A judgment under Count I that American Home has no obligation under any of the Primary Policies or the Bumbershoot Policy to defend or indemnify Pensacola for any of the liability alleged against it by the Homeowner Claimants;

B.    A judgment under Count II that American Home has no obligation to defend or indemnify Pensacola for the cost to repair, replace, remove and/or discard the allegedly defective drywall as such damage does not constitute an occurrence of property damage under any of the Primary Policies and the Bumbershoot Policy;

C.     A judgment under Count III that American Home has no obligation to defend or indemnify Pensacola for the cost to repair, replace, remove and/or discard the allegedly defective drywall as such damage is excluded under the exclusions of all of the Primary Policies and the Bumbershoot Policy;

D.     A judgment under Count IV that American Home has no obligation to defend and/or indemnify Pensacola under the Primary Policies for the claims of property damage to property other than the drywall itself caused by the release of and exposure to the corrosive hydrogen sulfide gaseous emissions from the allegedly defective drywall because coverage for such claims is excluded under the terms of the Health Hazard Exclusion and/or the Absolute Pollution Exclusion and/or the Pollution Limitation Endorsement;

E.     A judgment under Count V that it has no obligation to defend and/or indemnify Pensacola under the Bumbershoot Policy for the claims of bodily injury and any related injunctive relief, including, but not limited to, the demand for medical monitoring, caused by the release of and exposure to the corrosive hydrogen sulfide gaseous emissions because coverage for those claims is excluded under either or both the Health Hazard Exclusion and/or the Pollution Exclusion;

F.     A judgment under Count VI that American Home has no obligation under any of the Primary Policies or the Bumbershoot Policy to defend or indemnify Pensacola against any claim for punitive damages, fines, penalties, treble damages or any other damage resulting from the multiplication of compensatory damages;

G.     A judgment under Count VII that American Home has no obligation under any of the Primary Policies and the Bumbershoot Policy to defend or indemnify Pensacola for any of

the allegations asserted with regard to the Homeowner Claimants' request for any equitable and injunctive relief and medical monitoring;

H.     A judgment under Count VIII that that American Home has no obligation under any of the Primary Policies to defend or indemnify Pensacola for any alleged bodily injury or property damage asserted against Pensacola for which Pensacola is alleged to be or is found liable for that was expected or intended;

I.     A judgment under Count IX that there is no coverage under any of the Primary Policies and the Bumbershoot Policy for any liability of Pensacola for any breach of the Alabama Deceptive and Unfair Trade Practices Act

J.     A judgment under Count X that there is no coverage under any of the Primary Policies and the Bumbershoot Policy for any alleged liability of Pensacola arising out of the breach of a contractual obligation;

K.     A judgment under Count XI that American Home has no coverage obligations to Pensacola under Coverage Section 2 – Personal and Advertising Injury or Coverage Section 3 - Medical Payments of any of the Primary Policies for any of the liability alleged against Pensacola by the Homeowner Claimants;

L.     A judgment under Count XII that American Home has no obligation under the MTOL coverage provided by any of the Primary Policies for the defense or indemnity of Pensacola for any of the liability alleged against Pensacola by the Homeowner Claimants;

M.     A judgment under Count XIII that American Home has no coverage obligations to Pensacola for any property damage or bodily injury suffered by any Homeowner Claimant that did not occur within the respective Policy's effective policy period.

N.      In the alternative, if any of American Home's Primary Policies and/or the Bumbershoot Policy are found to provide coverage to Pensacola, a judgment under Count XIV that the allegations of bodily injury and property damage only trigger the Policy period in effect at the time of the first occurrence of the bodily injury or property damage from corrosive hydrogen sulfide gases being emitted from defective dry wall sold by Pensacola and all subsequent bodily injury and property damage from the same nature of defect in dry wall claimed by the Homeowner Claimants is a continuation of the same occurrence and subject to the per occurrence limits of the applicable Policy;

O.      In the alternative, if any of American Home's Primary Policies and/or the Bumbershoot Policy are found to provide coverage to Pensacola, a judgment under Count XV that any coverage afforded by any of the Primary and/or Bumbershoot Policies is excess to the coverage provided by any other insurance covering Pensacola's liability for the same damages asserted against it;

P.      Any and all additional recovery as this Court may deem proper.

Respectfully submitted this 16th day of June 2010.

/s/ Blane H. Crutchfield
Blane H. Crutchfield        (CRUTB4243)
Norman M. Stockman        (STOCN9440)
Attorneys for Plaintiff
American Home Assurance Company

HAND ARENDALL LLC
P.O. Box 123
Mobile, Alabama 36601
Tel:  (251) 432-5511
Fax: (251) 694-6375
Email: bcrutchfield@handarendall.com
         nstockman@handarendall.com

And

(Seeking Admission Pro Hac Vice)

/s/ C. Michael Johnson
C. Michael Johnson, Esquire
Georgia Bar No. 392550
Email: mjohnson@thejohnsonfirm.com
Laurie E. Dugoniths, Esquire
Georgia Bar No. 232297
Email: ldugoniths@thejohnsonfirm.com

**THE JOHNSON FIRM, LLC**
One Buckhead Plaza
3060 Peachtree Road, NW, Suite 1050
Atlanta, GA 30305
Tel: (404) 442-8834
Fax: (404) 442-8835

*Counsel for American Home Assurance Company*